# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A RESIDENCE LOCATED AT:<br><br>208 East Maple Street<br>Fair Grove, Missouri 65648<br>(Fully described in Attachment A to the Affidavit in Support of the Search Warrant) | 17-SW-2057DPR |

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

Affiant, after first being duly sworn, deposes and states the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I am employed by the United States Environmental Protection Agency, Criminal Investigation Division ("EPA-CID"). I am assigned to the Kansas City area office. I have been an EPA-CID special agent since November 2015 and have conducted or assisted numerous investigations of alleged violations of federal and state environmental laws. I was previously employed for eight years as an environmental engineer with the EPA, Air and Waste Management Division, responsible for conducting civil investigations under the Clean Air Act. As a special agent, I received extensive training on environmental laws and criminal investigations of environmental crimes. I am a graduate of the Federal Law Enforcement Training Center, Criminal Investigator Training Program. I also have a Bachelors of Science degree in Chemical Engineering from the University of Missouri-Columbia. In my capacity as an EPA criminal investigator, I have participated in numerous investigations, which included the execution of search warrants, relating to criminal violations of the environmental statutes, including violations of the Clean Water Act, Resource Conservation and Recovery Act ("RCRA") and Clean Air Act.

2. This affidavit is submitted in support of an application for a warrant allowing agents of the EPA-CID, personnel from the EPA's National Enforcement Investigations Center ("NEIC"),

and other appropriate federal and state personnel to search for and seize evidence of alleged criminal violations of RCRA, 42 U.S.C. § 6901, *et seq.*, related to drums containing improperly stored hazardous materials at a residence located at 208 East Maple Street, Fair Grove, Greene County, Missouri, a location within the Western District of Missouri, and more fully described in Attachment A to this affidavit. Attachment A is incorporated by reference into this affidavit.

## PROBABLE CAUSE

3. This investigation was undertaken as a result of information provided by an anonymous citizen to a Missouri State Senator's Office, which referred the matter to the Missouri Department of Natural Resources, EPA Region 7 Superfund Division, and ultimately to EPA-CID. The information indicated drums were observed at a location identified hereinafter as the Copperhead Lane Site, and the citizen voiced concerns of safety and potential well water impacts. Through the course of this investigation, the Affiant initially observed materials at the Copperhead Lane Site, a property adjacent to Copperhead Lane, Buffalo, Missouri, that are consistent with chemicals used in the dry cleaning industry. The Affiant has also observed materials at a location identified hereinafter as the Fieldstone Lane Site that are consistent with the materials found at the Copperhead Lane Site. The Affiant observed drum containers that are consistent at both sites, of which bore labels identifying the drums as originating in the dry cleaning industry. The drums were observed to be consistently situated at both sites, and were observed to have been done so in a manner that is readily accessible by rural farm roads, yet concealed by tree and brush cover. The two sites are less than eight road miles apart from one another. Charles M. and Tammy L. Jordan own the property known as the Copperhead Lane Site, and own the neighboring property to the Fieldstone Lane Site. The EPA-CID began an investigation to determine whether the Copperhead Lane and Fieldstone Lane Sites are being utilized to illegally store and/or dispose of hazardous

wastes under RCRA. Such investigation led to the discovery of additional drum containers at 208 East Maple Street, Fair Grove, Missouri. The Affiant observed that thes additional drums were consistent with the previously found drums and contained similar markings. The EPA-CID expanded its investigation to determine whether 208 East Maple Street is also being utilized to illegally store and/or dispose of hazardous wastes under RCRA.

## DESCRIPTION OF PREMISES

4. 208 East Maple Street, Fair Grove, Missouri 65648, is a five-acre parcel and sits on the south side of East Maple Street in Fair Grove, Missouri. The house is white in color with greenish-blue trim, and a greenish/gray roof. The house sits in the center of a horseshoe driveway and appears to be a single story residence. The house is flanked to the east by a large white barn with a gray roof. Several other out buildings sit to the south of the residence, as does an old grain silo.

## ITEMS TO BE SEIZED

5. Attached hereto as Attachment B is a list of the items to be seized at 208 East Maple Street, Fair Grove, Missouri. Attachment B is incorporated by reference into this affidavit.

## STATUTORY BACKGROUND OF THE
## RESOURCE CONSERVATION AND RECOVERY ACT (RCRA)

6. The Resource Conservation and Recovery Act ("RCRA") was enacted in 1976 and has among its stated objectives the protection of human health and the environment through regulation of the treatment, storage, transportation, and disposal of hazardous wastes. 42 U.S.C. § 6902. RCRA accomplishes its objectives by creating a "cradle-to-grave" regulatory system to govern, track, and manage hazardous wastes from the point of generation until its final disposition.

7. Among other things, the statute requires that EPA identify and list solid wastes that meet the statutory definition of hazardous waste.[1] These identified and listed hazardous wastes are then subject to the regulations established by the EPA regarding the handling of such hazardous wastes. 42 U.S.C. § 6921. In order to be regulated as a hazardous waste under RCRA, the material must first be a "solid waste." The term "solid waste" is defined as ". . . [A]ny garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining and agricultural operations, and from community activities . . . ." 42 U.S.C. § 6903(27); 40 C.F.R. § 261.2. Generally speaking, materials are considered solid waste if they are either discarded or abandoned.

8. Solid wastes include anything that is abandoned by disposal, burning, or accumulation or storage in lieu of disposal or burning. 40 C.F.R. § 261.2(b).

9. "Disposal" means "the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 40 C.F.R. § 260.10.

---

[1] 42 U.S.C. § 6903(5) defines "hazardous waste" as:

[A] solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may -- (A) cause or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

10. "Storage" means "the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed of, or stored elsewhere." 40 C.F.R. § 260.10.

11. A solid waste is considered hazardous under RCRA if it is either a specifically listed waste in the applicable regulations, or exhibits any of the following characteristics: ignitability, corrosivity, reactivity, or toxicity. The regulations identify certain characteristics of a waste, including ignitability or toxicity, that are evaluated to determine if a particular waste is hazardous. For example, ignitable wastes are deemed to include liquids which have a flash point of less than 140 degrees Fahrenheit.

12. Once a waste is identified as hazardous, it is subject to the regulations promulgated under RCRA. These regulations place varying degrees of regulatory requirements on generators of hazardous waste based upon the volume of waste generated by the generator in a calendar month. EPA has identified three classes of generators:

    A. Large Quantity Generators ("LQGs") generate more than 1,000 kilograms of hazardous waste per month, which is about five full 55-gallon drums. LQG must comply with extensive management requirements and can store hazardous waste only up to 90 days without a permit. 40 C.F.R. § 262.34(a).

    B. Small Quantity Generators ("SQGs") generate between 100 kilograms (which is about half of a 55-gallon drum) and 1,000 kilograms of hazardous waste per month. They are subject to reduced regulatory requirements. They are allowed to store hazardous waste for a longer period of time than LQGs. *See* 40 C.F.R. § 262.34(d) (180-day storage without a permit). The purpose of this longer storage period is to allow a smaller business more time to accumulate sufficient quantities of hazardous waste to make shipping and disposal more economical.

C.. The regulations also identify Conditionally Exempt Small Quantity Generators ("CESQGs") (generators of less than 100 kilograms of hazardous waste per month) who are exempt from RCRA regulations provided they meet certain conditions set forth in 40 C.F.R. § 261.5. These conditions include a requirement that CESQG waste be transported to or managed at (1) a state-permitted municipal or industrial solid waste facility; (2) a recycling facility that uses, reuses, or legitimately recycles or reclaims the wastes or treats wastes before such use; or (3) a RCRA permitted or interim status Treatment, Storage, and Disposal ("TSD") facility. 40 C.F.R. § 261.5(g)(3). In addition, to qualify for an exemption, a CESQG must determine whether the waste generated is hazardous and ensure that no more than 1,000 kilograms of hazardous waste is accumulated at any time. The exemption may be lost if the exempt waste is mixed with non-exempt waste. 40 C.F.R. § 261.5(i) provides in pertinent part that "[i]f any person mixes a solid waste with a hazardous waste that exceeds a quantity exclusion level of this section, the mixture is subject to full regulation."

13. The generator regulations require both LQGs and SQGs to: (1) determine whether their waste is hazardous pursuant to 40 C.F.R. § 262.11; (2) notify EPA as a generator and obtain EPA identification numbers; (3) store accumulated hazardous wastes in specified types of containers or areas and in compliance with the storage conditions set forth in 40 C.F.R. § 262.34; and (4) clearly label such drums or other containers as hazardous waste with the date the wastes began to be accumulated.

14. When a shipment of hazardous waste is sent offsite, the generator selects the transporter and the designated facility that will receive the hazardous waste. LQGs and SQGs must also prepare a Uniform Hazardous Waste Manifest ("manifest") when transporting the waste

off-site, as part of RCRA's cradle-to-grave tracking system to ensure that the wastes are properly transported to the permitted hazardous waste TSD facilities designated by the generator. The generator must retain one copy of the manifest signed by the generator and the transporter, and then give the remaining copies to the transporter. 40 C.F.R. § 262.23. If the generator does not receive a signed copy of the manifest from the designated TSD facility within 35 days of shipment, the generator must file an "Exception Report" to EPA. Generators are required to maintain copies of all signed manifests and exception reports, as well as any documentation regarding their hazardous waste determinations for a period of three years. 40 C.F.R. § 262.40.

15. Hazardous wastes may only be transported to, treated, stored, or disposed of at facilities that have received RCRA permits or interim status. These RCRA permits impose regulatory conditions specifically tailored to the activity of the particular facility, and the facility may only handle those wastes and perform those activities covered by the permit or by interim status.

16. Tetrachloroethylene – also known as "perc" which is short for perchloroethylene – is a chemical widely used in dry-cleaning processes and metal degreasing operations. EPA has classified it as likely to be carcinogenic to humans. U.S. Environmental Protection Agency, *Integrated Risk Information System on Tetrachloroethylene* (2012). When tetrachloroethylene has been rendered a spent solvent derived from dry-cleaning processes and metal degreasing operations, it is a listed hazardous waste and must be managed as such. 40 C.F.R. § 261.31. Additionally, wastes that are contaminated with tetrachloroethylene may exhibit the hazardous characteristic of toxicity under 40 C.F.R. § 261.24 if, using the Toxicity Characteristic Leaching Procedure ("TCLP"), the extract of the waste contains tetrachloroethylene concentrations over 0.7

milligrams per liter ("mg/L"), the regulatory level. As explained below, in this instance, the waste found on the Copperhead Lane Site is a characteristic hazardous waste.

17. Trichloroethylene, also known as TCE, is a toxic chemical used most often as an intermediate chemical for manufacturing refrigerant chemicals. It is also used as a solvent for metals degreasing and as a spotting agent in dry-cleaning facilities. It, too, is likely to be carcinogenic to humans. [https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/trichloroethylene-tce](https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/trichloroethylene-tce). Just as with tetrachloroethylene, when TCE has been rendered a spent solvent from dry-cleaning processes and metal degreasing operations, it is a listed hazardous waste and must be managed as such. 40 C.F.R. § 261.31. Additionally, wastes that are contaminated with trichloroethylene may exhibit the hazardous characteristic of toxicity under 40 C.F.R. § 261.24 if, using the TCLP, the extract of the waste contains trichloroethylene concentrations over 0.5 mg/L, the regulatory level. As explained below, in this instance, the waste found on the Copperhead Lane Site is a characteristic hazardous waste.

18. If hazardous waste is disposed of on land, toxic compounds can leach into the ground, thereby affecting the surrounding land and underground drinking water sources. In order to predict whether any particular waste is likely to leach chemicals into the ground at dangerous levels, EPA designed the TCLP lab procedure to replicate the leaching process. Thus, TCLP is the test used to determine toxicity and is included as Method 1311 in EPA's publication, *Test Methods for Evaluating Solid Waste: Physical/Chemical Methods*. TCLP is designed to determine the mobility of both organic and inorganic analytes present in liquid, solid, and multiphasic wastes.

19. When using TCLP to find the concentration in a waste stream of any one of the forty constituents listed in 40 C.F.R. § 261.24 – perc and TCE being two of the listed constituents

– and the resulting analysis shows a concentration greater than the regulatory level, then that waste has failed TCLP and is deemed a characteristic hazardous waste.

20. It is a crime for any person to knowingly transport, or cause to be transported, any hazardous waste to an unpermitted facility. 42 U.S.C. § 6928(d)(1).

21. It is a crime for any person to knowingly treat, store, or dispose of a hazardous waste without a permit or in violation of a permit. 42 U.S.C. § 6928(d)(2).

22. It is a crime for any person to knowingly generate, store, treat, transport, dispose of, export, or otherwise handle any hazardous waste and knowingly destroy, alter, conceal, or fail to file any record, application, manifest, report, or other document required to be maintained or filed for purposes of compliance with RCRA and regulations thereunder. 42 U.S.C. § 6928(d)(4).

23. It is a crime for any person to knowingly transport, or cause to be transported, any hazardous waste without a manifest. 42 U.S.C. § 6928(d)(5).

## REGULATORY BACKGROUND

24. According to EPA's Environmental Compliance History Online ("ECHO") database, found at www.echo.epa.gov, 208 East Maple Street, Fair Grove, Missouri, does not have a RCRA storage, disposal, or treatment permit, therefore the site has no regulatory background.

## FACTUAL BASIS REGARDING RCRA VIOLATIONS

25. On or about April 17, 2017, the Affiant received information from EPA Region 7's Superfund Division regarding a collection of drums found on property adjacent to Copperhead Lane, Buffalo, Missouri (hereinafter "Copperhead Lane Site"). EPA Region 7 Superfund Division received the complaint from the Missouri Department of Natural Resources ("MDNR"), which received the complaint from the office of Missouri State Senator Bob Dixon. Senator Dixon's office received the complaint from a concerned citizen who requested anonymity.

26. The Copperhead Lane Site, where the drums were found, is owned by Charles M. and Tammy L. Jordan, who reside at 11588 North Fieldstone Lane, Fair Grove, Missouri.

27. On or about April 19, 2017, EPA Superfund Division personnel visited the Copperhead Lane Site after Tammy L. Jordan gave verbal consent. Personnel collected samples from the drums for screening purposes and sent the samples to a laboratory for analysis.

28. On April 20, 2017, Tammy L. Jordan stated to the Affiant that she does not frequent the Copperhead Lane Site and does not know where the drums came from.

29. On or about April 20, 2017, through April 27, 2017, the Affiant walked onto the Copperhead Lane Site, as it was an open field, and personally observed approximately 38 20-gallon white-colored poly drums at the site, bearing labels containing the name "ADCO," a manufacturer of dry cleaning chemicals previously located in Sedalia, Missouri. The Affiant also observed labels reading "Leather Sheen II," an ADCO dry cleaning product. The drums were found in two separate locations: one cluster of 19 drums was found located near an out building; and another cluster of 19 drums was found approximately 30 yards to the northeast under tree cover. The drums were positioned in a manner where only the perimeter drums were readily accessible, and the drums were observed to be resting on the ground. Several of the drums were labeled with hand written dates ranging from "12-12-06" to "2-26-09." The drums near the out building, visible on aerial photographs dating back to March 2012, were badly deteriorated, and the surrounding vegetation was observed to be stressed or killed. The Affiant observed no other domiciles or shelter-related buildings on the Copperhead Lane Site.

30. On April 21, 2017, Tammy L. Jordan submitted a signed consent to search form to the Affiant, via e-mail. In the body of the e-mail, Tammy L. Jordan stated, "The pictures you sent

are very upsetting," in reference to photographs taken at the Copperhead Lane Site provided by the Affiant to indicate the scope of sampling activities.

31. On April 25, 2017, the Affiant received the laboratory results from the screening conducted by EPA Superfund Division on or about April 19, 2017, at the Copperhead Lane Site. The screening results stated that Tetrachloroethylene was found in concentrations greater than 0.7 mg/L, and Trichloroethylene was found to be greater than 0.5 mg/L.

32. On April 27, 2017, after obtaining written consent from Tammy L. Jordan, EPA-CID and NEIC, Denver, Colorado, conducted field sampling activities and collected soil and drum samples at the Copperhead Lane Site. A preliminary screening of the samples determined total concentrations of trichloroethylene to be greater than 0.5 milligrams per liter (mg/L). The preliminary screening results identified the material to be consistent with dry cleaning chemicals used in the dry cleaning industry.

33. On April 27, 2017, the Affiant interviewed Greg Turner at his residence located at 45 Copperhead Lane, Buffalo, Missouri. Greg Turner's residence sits across the street from the Copperhead Lane Site. Greg Turner stated he has lived at his current address since 2004, and stated the drums were already on the property when he moved in. Greg Turner stated he did not personally know the Copperhead Lane Site property owners, but said a green colored Chevrolet Silverado frequents the property, typically during the winter hunting season.

34. On April 27, 2017, the Affiant met and interviewed John Clouse at his residence located at 47 Copperfield Lane, Buffalo, Missouri. John Clouse's residence is situated across the street from the Copperhead Lane Site. Clouse stated that in 2006, during a walk, he saw about ten drums near the cabin structure. He said the drums under tree cover are newer, and he recalled a time when they were not out there. Clouse said people visit the property every one or two months

and they do not stay long, maybe one to two hours. Clouse stated the visitors drive a light colored Chevrolet pickup and are younger in age.

35. On May 1, 2017, the Affiant again interviewed Greg Turner and his wife, Sue Turner. Sue Turner stated she had been on the Copperhead Lane Site in 2005 and observed eight to ten drums situated by the cabin structure. She said she remembered the labels on the drums contained the word "leather."

36. In June 2017, while reviewing satellite imagery of Charles M. and Tammy L. Jordan's residence located at 11588 North Fieldstone Lane, the Affiant observed drum-shaped objects positioned on the adjacent property to the north of the Jordan's residence. The drum-shaped objects were observed to be approximately eight road miles away from the Copperhead Lane Site. In review of historic satellite imagery, the Affiant observed the drum shaped objects dating back to imagery dated March 8, 2012. In imagery dated April 29, 2008, the Affiant observed no drum shaped objects. According to the Greene County, Missouri Assessor's Office, the property is identified as Parcel ID 8800114400028, (hereinafter "Fieldstone Lane Site"), and lists Chris Irick as the owner.

37. On June 15, 2017, the Affiant and EPA-CID Special Agent Adrienne Ciolli walked onto the Fieldstone Lane Site, as it was an open field, and personally observed approximately 50 drums in the location identified by the Affiant from satellite imagery. The Affiant observed the drums were placed in a cluster in which only the perimeter drums were readily accessible. The Affiant did not observe any dates of accumulation on the drums, and the majority of the drums were observed to be resting directly on the ground.

38. Approximately 12 of the drums were 15 to 20-gallon white-colored poly drums, containing some quantity of unknown liquid material. One label on a 15-gallon white-colored

poly drum read "Quality Laundry Products, HEAVY LIQUID STARCH," and listed a manufacturer of "FabriClean Supply of Dallas Ltd." The label also read "DO NOT GET ON SKIN, IN EYES, OR TAKE INTERNALLY." The Affiant obtained a Material Safety Data Sheet ("MSDS") related to the information on the labels from www.fabricleansupply.com, which stated the following: "INHALATION, CAN IRRITATE NOSE, THROAT, AND LUNGS. SKIN CONTACT, CAN IRRITATE OR CHAP SKIN. INGESTION, WILL CAUSE GASTRIC DISTRESS, VOMITING AND DIARRHEA . . . RUBBER GLOVES SHOULD BE WORN . . . SAFETY GOGGLES SHOULD BE WORN . . . EXTREME TEMPERATURE WILL CAUSE PRODUCT TO SEPARATE. DO NOT ALLOW TO FREEZE. KEEP CONTAINERS CLOSED." Other labels on the 15 to 20-gallon white-colored poly drums were not legible.

39. The remainder of the drums were a mixture of 55-gallon steel drums and 55-gallon poly drums. The collection of 55-gallon drums contained quantities of an unknown material and to be in various states of condition, ranging from undamaged to dented and rusted. The 55-gallon drums were positioned near a tree line, and significant vegetation growth was observed growing around and amongst the collection of drums.

40. Several of the 55-gallon drums were observed by the Affiant to have unknown liquid pooling on the lid of the drum, ranging in color from clear to dark brown. In one location, potentially impacted soil was observed and the vegetation was observed to be stressed or killed. A number of 55-gallon drums with bulging lids were also observed by the Affiant.

41. One 55-gallon drum displayed a label containing the words "ECOSOLV," and "AUG6 2007." The Affiant obtained a MSDS related to the information on the labels from www.cpchem.com, which stated the following: "OSHA HAZARDS: Combustible Liquid, Aspiration Hazard . . . May be fatal if swallowed and enters airways . . . Keep away from

heat/sparks/open flames/hot surfaces. No smoking. Wear protective gloves/eye protection/face protection . . . Store in a well-ventilated place. Keep cool. Store locked up. Dispose of contents/container to an approved waste disposal plant . . . Prevent product from entering drains. Prevent further leakage or spillage if safe to do so. If the product contaminates rivers and lakes inform the respective authorities."

42. Another 55-gallon drum displayed a label reading "TURBO TEX," and read "Liquid Anti-Chlor/Laundry Rinse Additive." The Affiant obtained a MSDS related to the information on the labels from www.ecolab.com, which stated the following: "Hazard Statements: Causes skin irritation. Causes serious eye irritation. May cause respiratory irritation . . . Avoid breathing dust/fume/gas/mist/vapors/spray. Wash skin thoroughly after handling. Use only outdoors or in a well-ventilated area. Wear eye protection/face protection. Wear protective gloves . . . Store in well-ventilated place. Keep container tightly closed. Store locked up . . . Dispose of contents/container to an approved waste disposal plant . . . Do not allow contact with soil, surface, or ground water . . . Do not reuse empty containers.

43. Another 55-gallon drum displayed a label reading "DF-2000 FLUID," and "Aliphatic Hydrocarbon." The label further stated "WARNING! Combustible. MAY CAUSE EYE AND SKIN IRRITATION, MAY CAUSE RESPIRATORY IRRITATION, HARMFUL IF SWALLOWED." The Affiant obtained a MSDS related to the information on the labels from www.exxonmobilchemical.com, which stated the following: "OSHA HAZARD Combustible . . . Slightly irritating but does not injure eye tissue . . . Low order of toxicity. Frequent or prolonged contact may irritate and cause dermatitis . . . High vapor/aerosol concentrations (attainable at elevated temperatures well above ambient) are irritating to the eyes and the respiratory tract, and may cause headaches, dizziness, anesthesia, drowsiness, unconsciousness, and other central

nervous system effects, including death . . . Small amounts of this product aspirated into the respiratory system during ingestion or vomiting may cause mild to severe pulmonary injury, possibly progressing to death. Minimal toxicity. Combustible liquid, can form combustible mixtures at temperatures at or about flashpoint. Static Discharge, material can accumulate static charges, which can cause an incendiary electrical discharge. 'Empty' containers retain product residue and can be dangerous . . . THEY MAY EXPLODE AND CAUSE INJURY OR DEATH . . . Empty drums should be completely drained, properly bunged and promptly returned to a drum preconditioner, or properly disposed of."

44. One 55-gallon drum displayed a label containing the words "Polyurethane Foam" and "348-M B-RESIN." The Affiant obtained a MSDS related to the information on the label from www.aldoproducts.com, which stated the following: "CAUTION: MAY CAUSE EYE, SKIN, AND RESPIRATORY TRACT IRRITATION. SENSITIZER. CONTAINS MATERIAL WHICH CAN CAUSE NERVOUS SYSTEM DAMAGE . . . Protect from direct sunlight. Keep in a cool, well-ventilated place. Avoid extreme heat. Store protected against freezing. Stored and transported in a cylinder under pressure. Must not be repacked by customer . . . Storage temperature: 50 - 80°F . . . Conditions to avoid: > 80 °F. Avoid direct sunlight. Avoid Excessive temperatures . . . Waste and Disposal of substance: Incinerate in a licensed facility. Dispose of in a licensed facility. Do not discharge substance/product into the sewer system."

45. Another 55-gallon drum displayed a label reading "ELASTOSPRAY 81272 R RESIN." The Affiant did not observe any additional label information, and the Affiant could not locate any manufacturer safety information for this product.

46. Based upon the labels the Affiant observed on the drums, the information the Affiant found online concerning the chemicals referred to on the labels, and the Affiant's training

15

and experience, the chemicals in the drums appear to have hazardous properties. Additionally, the drums have been aggregated in a waste-like manner in an area that is overgrown with vegetation. The drums are at various stages of degradation, and the ground and vegetation was observed to have been impacted by an unknown material.

47. Through the course of this investigation, the Affiant observed materials at the Copperhead Lane Site that are consistent with chemicals used in the dry cleaning industry. The Affiant has also observed materials at the Fieldstone Lane Site that are consistent with the materials found at the Copperhead Lane Site. The Affiant observed drums that are consistent at both sites, of which bore labels identifying the drums as originating in the dry cleaning industry. The drums were observed to be consistently situated at both sites, and were observed to have been done so in a matter that is readily accessible by rural farm roads, yet concealed by tree and brush cover.

48. On June 22, 2017, the Affiant and additional agents of EPA-CID, EPA-NEIC, and the Greene County, Missouri, Sheriff's Office executed a search warrant issued by Magistrate Judge David P. Rush of the Western District of Missouri on the Fieldstone Lane Site, case no. 17-SW-2056DPR. As a part of the execution of that search warrant, the Affiant and the additional agents also conducted interviews, seized environmental samples, and seized indicia of ownership documents pertaining to vehicles located on the Fieldstone Lane Site.

49. During the execution of the search warrant, the Affiant spoke by telephone to Sean Jones, the brother of Chris Irick, owner of the Fieldstone Lane Site. Sean Jones told the Affiant that he transported the drums to both the Fieldstone Lane Site and the Copperhead Lane Site approximately eight to ten years ago. Sean Jones said he had an agreement with Jack Dueck, the owner of a leather coat cleaning shop located near West Bypass and Nichols Street in Springfield, Greene County, Missouri, to clean out Dueck's shop because Dueck was going out of business.

Sean Jones said Dueck's lease was expiring and he needed to get everything out of the building, including the drums. Sean Jones said that Dueck told him that the material in the drums would "work great for a burn pile." Sean Jones also said that Dueck told him that he could "get a metal barrel, put a little of the material in there, some trash, and it would burn until there was sludge." Sean Jones said Dueck paid him $500.00, plus all of the scrap metal he could salvage from the shop. Sean Jones identified Jack Dueck as a tall man in his 60s with a mustache, and said that Dueck lived on Maple Street in Fair Grove, Missouri.

50. One June 22, 2017, the Affiant and EPA-CID Special Agent Kenny Jamison met and interviewed Jack Dueck at his residence, located at 208 East Maple Street, Fair Grove, Greene County, Missouri, a location within the Western District of Missouri. Dueck confirmed that he had a verbal agreement with Sean Jones to take the drums from his shop, and Dueck said Sean Jones told him he was going to use the material for road dust suppression. Dueck stated he did not remember paying Sean Jones $500.00, but later said his wife at the time, Margaret, paid Sean Jones the $500.00. Dueck also stated to the Affiant that he currently had some drums on his property at 208 East Maple Street. At the request of the Affiant, Dueck showed the Affiant and Special Agent Jamison seven additional drums on his property. The Affiant observed one drum in an open field, three drums along the back wall of an outbuilding on the south side of the property, and another three drums inside of a barn to the east of his residence. The Affiant observed one drum label to read "DF-2000 FLUID," "Aliphatic Hydrocarbon," and "WARNING." The Affiant observed another drum label to read "Aliphatic Hydrocarbon" and "WARNING." The Affiant previously observed similar labels on the drums found at the Fieldstone Lane Site.

51. When Dueck showed the Affiant and Special Agent Jamison the drums and his property, the Affiant also observed other items and equipment from Dueck's business, Suede

17

Masters. Dueck identified a van from Suede Master's fleet, a filter bank, and a solvent still. Dueck stated to the Affiant that file cabinets they observed in the east barn were empty and all of the files from the business were locked in the Suede Master building after the landlord changed the locks.

52. Based upon the labels the Affiant observed on the drums at each of the three described locations, the information the Affiant found online concerning the chemicals referred to on the labels, the statements made by Sean Jones and Jack Dueck, and the Affiant's training and experience, I have probable cause to believe that the chemicals in the drums at the residence at 208 East Maple Street have hazardous properties.

### **SPECIAL CONDITIONS PERTINENT TO SEARCH**

53. If authorized by the Court, the following special conditions are applicable to the search of 208 East Maple Street, Fair Grove Missouri, as described in Attachments A and B:

    A. Special Agents with the EPA-CID will be leading the execution of this search warrant. The special agents executing the search warrant are authorized to enlist the assistance of necessary personnel from the EPA's NEIC, and other appropriate federal and state personnel in the execution of this warrant. Hereafter, said authorized personnel shall be referred to as the "search team;"

    B. The search team is authorized to bring to the premises to be searched whatever equipment and materials are necessary to safely and accurately conduct the search;

    C. The search team is authorized to inventory, photograph, and if deemed necessary, seize a representative number of samples of materials that are being stored or disposed of at the site at the time of the search;

D. The search team shall be allowed to photograph and videotape all interior and exterior portions of the premises; and

E. The search team is authorized to exclude from the search site and from any immediately surrounding vicinity, areas designated by the search team as potentially unsafe, all persons who are not authorized to assist in the search. Search team members may bar all public access during the activity if the presence of such persons will interfere with the efficient or safe performance of the activities authorized by the warrant.

## **CONCLUSION**

54. Based on the information set forth above, and on the Affiant's training and experience, there is probable cause that criminal violations of RCRA have occurred, and evidence, detailed in Attachment B, of these crimes is at the residence located at 208 East Maple Street, Fair Grove, Missouri, as further defined in Attachment A. Therefore, it is respectfully requested that a search warrant be issued allowing special agents of the EPA-CID, with proper assistance from other law enforcement officers and other designated persons, to search the premises known and described in Attachment A, for evidence, fruits, and instrumentalities of the commission of the crimes detailed above and as stated in Attachment B.

Presented by reliable electronic means and sworn to telephonically

Hugh J. McCullough, Special Agent
EPA Criminal Investigation Division

Sworn to by telephone on June 28, 2017
~~Subscribed and sworn to before me this 28th day of June 2017~~.

*[signature: Sarah W. Hays]*

HONORABLE SARAH W. HAYS
Chief United States Magistrate Judge
Western District of Missouri